## HEWITT v. AMERICAN TELEPHONE & TELEGRAPH CO.

(District Court, S. D. New York. January 20, 1920.)

1. Patents ⬡218(1)—License held to require payment of royalties only if licensee's device infringed.

A licensee, who agreed to pay royalties on instruments used by it embodying, or made or operating in accordance with, the inventions of the licensor, is required to pay royalties only on devices which in effect infringe the licensor's patent.

2. Patents ⬡328—781,001, claim 1, and 781,002, claim 3, for vapor amplifier, held not infringed.

The Hewitt patents, No. 781,001, claim 1, and No. 781,002, claim 3, for an apparatus and method of amplifying variable electrical currents by a gas or vapor conductor in the circuit, held not infringed by audion repeaters, which generated a new and stronger electrical current having the same variations as the primary current, though the repeater used a bulb in which an infinitesimal quantity of air remained.

3. Patents ⬡229, 234—Presence of infinitesimal amount of air, performing no function, does not make audion a "vapor conductor."

Relative to infringement of an apparatus and a method, an audion bulb, in which the current passed from the filament to a plate, is not a vapor conductor, though an infinitesimal quantity of air was left in the bulb, which performed no function, but was merely left because it was not practical or economical to exhaust it.

4. Patents ⬡328—1,120,949, claims 1, 7, 11, 13, 18, 19, and 1,121,359, claims 2–4, for increasing resistance of electrodes, held not infringed.

The Hewitt patents, No. 1,120,949, claims 1, 7, 11, 13, 18, 19, and No. 1,121,359, claims 2 to 4, for an apparatus and method for increasing resistance to starting a current at an electrode by inducing in the vapor around the electrode a higher charge than is induced solely by the application of current through the terminals, is not infringed by an audion repeater consisting of a bulb in which the current passed from the filament to a plate, though between the two was a charged grid acting merely to vary the amount of the current, and not to prevent the starting or flow of an undesired current.

In Equity. Suit by Peter Cooper Hewitt against the American Telephone & Telegraph Company. Bill dismissed.

Kerr, Page, Cooper & Hayward, of New York City (Drury W. Cooper, of New York City, of counsel), for plaintiff.

Frederick P. Fish, of Boston, Mass., and Charles Neave, George E. Folk, and William R. Ballard, all of New York City, for defendant.

MAYER, District Judge. The suit, in effect, calls for the interpretation of patents in respect of certain devices, although the nature of the suit is an alleged breach of contract. As discovery and specific performance, as well as damages, are sought, the cause is in equity.

The question in the case is whether, in making and using a single form of device, referred to by defendant as its audion type of telephone repeaters, connected up and operated on its wire circuits, the defendant is utilizing the following claims of certain patents owned by plaintiff, viz.: Patent No. 781,001, claim 1; patent No. 781,002, claim

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3; patent No. 1,120,949, claims 1, 7, 11, 13, 18, 19; patent No. 1,121,-359, claims 2, 3, 4.

The controversy between the parties arises out of contract relations between them. On December 16, 1912, plaintiff and defendant entered into an option agreement by which defendant acquired a right to obtain a license from plaintiff in the form set forth in a draft of license, marked "Agreement A," forming a part of the option agreement. On December 15, 1913, the parties entered into a license agreement which is the controlling contract between the parties, although, of course, the proceeding papers may be read in connection with the license agreement of December 15, 1913, for purposes of interpretation.

Without too detailed a discussion of the provisions of these documents, the essential features may be outlined. Under clause 1 of the license agreement, Hewitt granted to the Telephone Company the right to make and use—

"in telephone or telegraph systems employing wires or metallic conductors connecting stations, gas or vapor and so-called vacuum electric apparatus for creating, transmitting, receiving, relaying, repeating, modifying, amplifying or boosting telephonic or telegraphic electric currents, waves or impulses, or (in so far as not in conflict with the agreements above referred to) for lightning arresters, or strong current discharger or protector, or charge or voltage limiters, embodying or made or operating in accordance with any and all inventions which he has heretofore made either alone or jointly with others (all of which devices are, for convenience, herein called C. N. T. devices) and to sell and lease such C. N. T. devices to others. * * * "

In the draft of license forming a part of the option agreement, the gas or vapor, etc., devices for creating, transmitting, etc., electric waves or impulses were stated as being called C. N. T. devices. In the license agreement those devices are called C. N. T. devices only when embodying some of the Hewitt inventions. The grant covered all inventions which Hewitt had theretofore made, whether or not patents had already been issued for them. He had then made many inventions, among which were those set forth in eight enumerated patents; but such enumeration did not purport to specify all that were included within the grant. Hewitt has made many valuable contributions to science, and between 100 and 200 patents have been issued to him.

Under clause 2 of the license Hewitt agreed to grant similar licenses, at the option of the Telephone Company, under inventions made by him up to January, 1921. The Telephone Company agreed, in clause 4, to report periodically the number of installations of the devices "embodying or operating in accordance with the inventions of any unexpired patent or patents under which this license is granted," and to pay royalties "for each such installation so reported." The license is exclusive so long as at least $10,000 is paid in each year. The Telephone Company has reported and paid royalties upon certain devices, but is not reporting or paying royalties with reference to certain other devices, nor disclosing to Hewitt its improvements with reference to such other devices.

The devices which it has reported and upon which it has paid royalties are mercury vapor repeaters magnetically controlled, those being

covered by the Hewitt patents, 749,791 and 749,792, specifically mentioned in the license, but not here in suit. The devices which it has not reported as coming under the license, and upon which it has not paid royalties, are repeaters of the audion type, containing a heated filament, a grid, and a plate, but not containing mercury vapor, and, as contended by defendant, not utilizing any vapor or gas of any kind.

[1] In my opinion, the construction of the license leads to the conclusion that plaintiff cannot succeed, unless the repeaters used by it are devices "embodying or operating" the claims of the licensed patents, supra. Of course, invalidity cannot be asserted by defendant, and therefore, upon the construction of the license as above set forth, both parties agree that the paramount issues of the case are, in effect, the same as in an infringement suit.

[2] Hewitt patents, Nos. 781,001 and 781,002.—The disclosures of these two patents are identical as to specifications and drawings, the difference being only in the claims; the first being an apparatus and the second a method patent.

"In certain patents granted to me September 17, 1901," the patentee states, "attention is called to the fact that the resistance of an inclosed vapor or gas-carrying current in an electric circuit varies inversely with the current carried by the vapor. Accordingly, if a varying potential be applied to an apparatus of the general character described in the patents referred to, a variation of current will take place in the inclosed gas or vapor, and this variation of current will affect the entire circuit in which the apparatus is included, and if the circuit is so arranged that the gas or vapor apparatus shall represent a considerable portion of the total resistance of the circuit the variations of current thus caused in the conducting gas or vapor will cause comparatively large variation in the entire circuit. It is customary to operate electric circuits for various purposes by causing variations of potential in the circuit, such variations being utilized to influence appropriate receiving apparatus. In the present invention I avail myself of the peculiar features of electrical resistance in a gas or vapor conductor to vary or magnify the effects produced by potential variations in a circuit. By virtue of the described characteristics of gas or vapor conductors it is possible, for instance, to translate variations of potential in a circuit into variations of current or quantity, and inasmuch as the conducting gas or vapor responds practically instantaneously to the applied variations of potential, currents of any practical rapidity or frequency can be made to undergo the described transformation and produce their effects upon a suitable receiving apparatus. As the practical result of an increase of applied potential is an increased flow of current, the original electrical impulses in the circuit may produce magnified effects as compared with those which the same impulses would produce if applied directly to the receivers."

The claim reads:

"1. The combination in an electric circuit, of a source of potential variation, a receiving apparatus adapted to translate the variations caused by the source, and an inclosed gas or vapor conducting medium."

Hewitt shows in his drawing a single circuit, in which there are included a battery 1, a transmitter or potential changing apparatus 3, a mercury vapor tube 5, and a receiver 4.

The claim supra shows that the circuit is an electric circuit; i. e., one circuit in which the mercury vapor tube, transmitter, receiver, and battery are in series. Dr. Millikan, defendant's expert, testified:

"The only way you can possibly amplify by inserting a device into a series circuit of this sort is by getting a device which actually subtracts some resistance that is already there; that is what a negative resistance does. A negative resistance is defined as a negative value of the increment in potential over the increment in current, and if, for the frequency used in speech, the inserted device has that negative value, that means that it actually subtracts a certain amount of the resistance that is already in the circuit, and therefore allows a larger current to flow. * * * The condition for amplification in such a circuit is that there be a falling electromotive force current characteristic. * * * It is the principle of the introduction into a series circuit of a negative resistance which amplifies, simply because it annuls a certain part of the resistance that is already there. It simply subtracts a certain resistance from the circuit, and it will amplify just in the proportion which the subtracted resistance bears to the resistance of the whole circuit."

As the result of this and other testimony, I am satisfied that, as contended by defendant, in the Hewitt circuit, if amplification results, it is entirely due to the device having the characteristic that the potential across its terminals decreases under increase of current, and this is the "peculiar feature of electrical resistance in a gas or vapor conductor" referred to in the specification. Mr. Hogan, plaintiff's expert, in effect, came to the same opinion.

The operation and characteristic of the Hewitt device are due to the presence of gas or vapor in the Hewitt conducting space. There is no doubt that mercury vapor devices may be so connected up and operated as to act as amplifiers, without relying upon this characteristic for the production of the amplification, but not in a circuit such as set forth in the patents in suit.

Looking, as we must, at the claim, the expression is found "an inclosed gas or vapor conducting medium." Not only this language, but the nature of the patent, indicates that there is to be a medium characterized by the presence of a gas or vapor. If this conclusion be correct, then plaintiff's "conducting medium" is radically different from defendant's device, and is not consonant with defendant's theory of operation.

The fundamental principle of operation of defendant's device, according to defendant's contention, is that of a relay. The circuit in which the variations are caused in response to the voice waves does not extend to the distant receiver but ends in the repeater. Defendant contends that its so-called audion type of device is essentially a retransmitter or repeater of variations into another circuit, in which they appear as amplified variations. The Hewitt device, per contra, does not repeat anything. It acts merely to amplify or magnify the current changes in the circuit in which it is placed, and goes no further. Are defendant's contentions as to this device sound?

Defendant's device consists of an evacuated glass vessel with three electrodes sealed in it: (1) The filament heated by an electric current; (2) a grid; (3) a plate. The input circuit is connected with (1) and (2), and the output circuit with (1) and (3). The arrangement is that covered by claims 4 and 6 of De Forest's patent, No. 841,387, as to which the Marconi Company confessed judgment in Marconi v. De Forest (D. C.) 236 Fed. 942. Defendant's device is called an "audion type," rather than "audion," because, as constructed and used by de-

fendant, it differs somewhat from the commercial audion of De Forest.

The testimony shows that the Telephone Company very naturally has directed its attention to developing instrumentalities designed to make speech clearly heard at the receiver at the end of long distances. To this end the Shreeve mechanical repeater went into commercial use on the New York-Chicago long-distance 'phone line in 1904, and gradually went into extensive use, and is still in use. In 1911 the Telephone Company first began work on mercury vapor repeaters and developed one form of repeater upon which royalties have been paid to Hewitt under patents included in the license, but not here in issue. In October, 1912, the audion type of repeater was called to defendant's attention, the work was begun to develop this avenue of improvement. Experimentation on the mercury vapor and on the audion type repeaters was continued until late in 1915, when, owing to the unsatisfactory results from the mercury vapor device, further investigation in that direction was discontinued, and the practical art, so far as exemplified by defendant, has been confined to the mechanical repeater and the audion type repeater.

From the foregoing, it is apparent that defendant is concerned only with finding out and utilizing the most effective devices. Obviously the more efficient its long-distance service becomes, the more it will be used and be of commercial value; and the case, therefore, is not one where a disingenuous licensee seeks to avoid just payment, but where a licensee refuses to pay, because it believes other means more efficient, and insists that those other means do not utilize what the license covers.

Defendant's device is shown in plaintiff's Exhibit 33. The repeater is illustrated at 5 and the filament is continually kept heated by means of current from the battery B. The terminals of the "input" circuit from the transmitter at the left are connected to the filament and the grid; this circuit including a battery Bg, the negative terminal of which is connected with the grid. The "output" circuit, to the right, includes a local battery 1, the negative pole of which is connected with the filament and the positive pole to the plate, so that the filament is always negative with relation to the plate.

This current from battery 1 is always flowing in the output circuit. Nittorf and Goldstein disclosed in 1885 that, if the negative electrode or terminal (the filament) in an evacuated space is heated, current will flow through the space between the separated negative (filament) and positive (plate) terminals in that space. This output circuit, in which current continuously flows from the battery 1, includes the receiver 4 and plate and filament of the repeater 5. The function of the input circuit, which includes the transmitter 3 and the grid and filament of the repeater, is to cause variations in the resistance to the flow of current in the output circuit between filament and plate. The action of the grid is that of a capacity charged to a potential rather than that of a current flowing.

When the electrical variations produced in the input circuit by the transmitter come to the repeater, their effect is to cause corresponding

changes in the current in the output circuit, and those variations act on the receiver to produce corresponding sound waves. The operation of the circuit which uses the audion type of device is the same as that of the circuit in which the mechanical repeater has been used for the past fifteen years. The mechanical repeater installation is shown diagrammatically in plaintiff's Exhibit 28.

In both the mechanical repeater and the audion type repeater the input variations caused by the transmitter never reach the distant receiver, but end at the repeater, where they act upon the repeater element to vary the current supplied to the output circuit by the local battery. So the sounds acting upon the transmitter, or rather the corresponding electric variations, are repeated in another circuit, where variations similar in form, but larger in volume, are created to act upon the distant receiver.

Devices of this sort, connected to operate in this manner, are known as "relay" devices, and a relay in the sense here used is a device connecting two individually distinct circuits, whereby the signals of one are repeated into the other. The relay is affected by the exhausted impulses at the end of a long circuit, and operates to repeat or reproduce impulses of the same character in another circuit as strong newly generated impulses using a new source of energy. The audion relay, or valve, is virtually the voice, and the transmitter operated thereby, of the second circuit.

In summarizing the relay action or principle in accordance with which the defendant's devices in controversy operate, Millikan testified:

"The alternating electromotive forces * * * pass to the grid and filament, and the changing potentials between the filament and the grid act to release greater or smaller quantities of current between the filament and the plate. In other words, defendant's device is what I will term a valve device, in which the energy released in the secondary circuit bears no necessary quantitive relation to the energy flowing in the primary circuit. The wave forms in the two circuits are the same; that is, the condition is one of distortionless repetition, but the amplification here is due to these electromotive forces or potential differences impressed between the filament and the grid (even though there are no currents flowing whatever between the filament and the grid) releasing new currents in the secondary circuit."

On the question as to the character of the space within defendant's bulb—i. e., whether it contains gas or vapor—the answer is that there is substantially no air, gas or vapor therein. The defendant's tubes are exhausted to such a degree that the pressure remaining in them balances a mercury column of only one 100-thousandth of a millimeter, or less, which is one 76-millionth part of ordinary atmospheric pressure, or about one 5-millionth part of a pound.

On the point that this minute amount of gas does not take any part in the operation of defendant's devices, I accept the summary of facts in the brief of defendant's counsel.

(1) The pressure does not rise when the device is heated, as it would if an appreciable amount of gas were present.

(2) No appreciable amount of current flows between filament and grid, and such current would flow if gas or vapor took any part in the operation of the device. There is a small leakage current there

amounting between filament and plate, but it is ineffective for any purpose and does not figure in the operation.

(3) The device works no differently, if even less gas or vapor is present; it is merely useless and uneconomical to reduce the pressure to a lower point.

(4) The space inside of the defendant's tubes does not glow, as it would if gas were taking part in the operation.

(5) During operation, the temperature of defendant's filament does not change, as it would if appreciable gas were present.

(6) If, during operation, the temperature of the filament is intentionally increased, the current flow between filament and plate is not altered, as it would be if gas took part in the operation of the device.

(7) If gas or mercury is introduced into the defendant's tube while the device is operating, the usefulness of the tube is ended, as its amplifying qualities were destroyed.

The reasons leading to this conclusion are fully developed in the testimony and clearly set forth in the brief. They are highly technical in character, and it is sufficient to state the conclusion without elaboration; for to one desiring to form an independent judgment, a reading of the testimony on this and other points is necessary, in order even to attempt to understand these features of the controversy.

I was very much impressed with Millikan's testimony, both in respect of those matters which seemed fairly tangible as well as to the purely theoretical side. It seemed to me that cross-examination at the instance of able counsel failed to impair, in the slightest degree, the clear, logical explanations by this highly trained expert of actions and subject-matter often quite obstruse. On the contrary, the testimony of Hogan (for whom on more than one occasion this court has expressed marked appreciation) was quite often inconsistent and unsatisfactory, due not to any lack of ability or intellectual integrity, but due to the difficulty of the facts which confronted him and the mental attitude in which an expert sometimes finds himself of seeing the facts only in the light of his theory. When the theory fails, the facts often take on another aspect, or vice versa.

[3] Finally, it remains to consider the point that there is an infinitesimal amount of air in the evacuated space of defendant's bulb. To hold that this fact, which is irrelevant to the principle on which defendant's devices act, justifies the conclusion that defendant infringes, would be to substitute words for substance. Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 568, 18 Sup. Ct. 707, 42 L. Ed. 1136; Westinghouse Air Brake Co. v. New York Air Brake Co., 119 Fed. 874, 56 C. C. A. 404; Western Electric Co. v. Western Tel. Const. Co. et al. (C. C.) 79 Fed. 959, 961.

The foregoing conclusions render unnecessary a consideration of the prior art, which otherwise might be seriously considered. In addition to all which has been said, the experimental demonstration in the courtroom and at Dr. Hewitt's laboratory tend to confirm all that defendant contends for. It seems to me that defendant's devices exemplify

operation on a principle and modes of operation so clearly different from those of plaintiff that plaintiff has failed to show that defendant uses devices "embodying or made or operating in accordance with" the inventions of plaintiff here under consideration.

[4] Patents Nos. 1,120,949 and 1,121,359—No. 1,120,949 is the apparatus, and No. 1,121,359 the method, patent. The drawings are the same, except that the method patent contains a Figure 5 not in the other patent, and to that extent only the descriptions are different. These patents do not relate to repeaters nor amplifiers, telephone operations nor circuits.

"The object of this invention," Hewitt stated in his specification, "is to render more difficult the starting of a current into an electrode which for the time being may be negative; that is to say, to strengthen the normal initial resistance to starting at a negative electrode."

The claims 2, 3, and 4 are sufficiently illustrated by reference to claim 2, which reads:

"2. The method of increasing the resistance to starting at an electrode which is negative with relation to another electrode in a vapor electric device, which consists in inducing in the vapor a higher charge than that which is induced solely by the application of current through the terminals of the apparatus."

In the apparatus patent, the same object is sought, and Claims 1 and 13 will indicate the invention claimed.

"1. In an evacuated electric apparatus, a container, electrodes therefor, and a shield at one electrode, and means for charging the said shield independent of the conductor leading to said electrode."

"13. The combination with an evacuated chamber, two electrodes with a conductor within the chamber, the conductor being of a polarity opposite to that of one of the electrodes, an electric circuit connected with the two electrodes and means for charging the conductor electrically."

The theory of the invention is thus described in the patents:

"I have found that under certain conditions the vapor in the neighborhood of the negative electrode of a vapor device, and particularly at a small distance from the surface thereof, is, before the current actually passes, charged inductively in a sense opposite to the charge of the negative electrode itself, and not in the same sense; that is to say, the vapor at a short distance from the surface of the negative electrode is charged positively as if by induction. Appearances seem to indicate that the vapor in close proximity to the surface of the negative electrode so arranges itself that it acts as a dielectric, while farther away it is capable of assuming a charge as if it were a conductor. For the purpose of the present invention, this apparent dielectric action may be considered the cause of the high initial reluctance or resistance to the passage of the current. As already stated, the present invention concerns itself with amplifying this effect, so as to still further increase this reluctance or resistance to starting.

"For example, I have placed near the negative electrode an exploring disk or ring, and when the said disk or ring was charged negatively by means of a static machine the device occasionally started of itself; the terminals being connected with a continuous current circuit carrying a current of 110 volts. When, however, the ring was charged positively even to a greater potential, the device did not start. On introducing a spark gap, when charged positively, so that the ring was allowed to charge and discharge itself, the device started into operation. By reason of these facts the ring may be made to still further increase the potential of the inductive effects from the negative electrode.

The difficulty of starting may be increased by causing the inductive effect of the ring to preponderate over the inductive effect of the current at the negative electrode, modifying it to a great extent, and may be used for assisting these reactions for useful purposes. Certain superimposed charges appear to lessen the tendency of a negative electrode to disintegrate, and thus assist in preventing the lowering of the reluctance or resistance to starting from this cause. It appears from the discovery thus made that the vapor close to a negative electrode interposes between the said electrode and an electrode which is positive to it in an apparatus, a dielectric condition which can be further increased by inducing a greater charge than that which the electrode itself would induce. I propose to make use of this principle of operation by surrounding an electrode or electrodes of a vapor apparatus or other vapor device with a shield capable of receiving a charge that will augment or assist the charge which would naturally be present at a negative electrode. The device for producing this charge may be any suitable device, but is herein illustrated as a transformer of small current capacity, but of higher potential than that at the negative, and is connected to shields thereby assisting the charge. The action is not essentially that of current flowing, but more nearly that of capacity charged to the required potential. The shield, when properly connected electrically, has the effect of increasing the starting resistance at an electrode, being negative for the time being to another positive, and thus tending to assist in preventing current passing between these electrodes. In this high potential circuit a condenser may be introduced in order to actually limit the flow of more than a specific amount of current, and further the neutral points of the windings of the transformers may be all connected together, so as to insure the same zero point or a positive difference of potential at the terminals.

"I have found in certain experiments under the certain degrees of impurity of the gases and under certain conditions, and particularly where other gases were present than those of mercury vapor, that the effects herein stated may be reversed or changed. In other words, under the peculiar conditions of materials and manufacture used, there are instances where the actual reversal of the operation described will tend to take place, so that under particular conditions to get at the result desired it becomes necessary to connect the apparatus, here shown in the one sense, in the other sense to obtain results. These conditions may be considered as abnormal, and are to be avoided by further cleansing and exhaustion for the removal of the cause, except in instances where such abnormal conditions are desirable. Incidentally the shields may constitute chambers inclosing the various electrodes and thus serve to screen the various electrodes from the effects of certain discharge when one or the other of them is temporarily a negative electrode and another a positive electrode. The shield surrounding a given positive electrode may be made to substantially inclose the electrode or not, as is found most practical in use, or may be made wholly or in part of conducting material. * * * Screens or shields, such as herein described, serve to increase the normal resistance to starting between the positive electrodes, and also to reduce the danger of short-circuiting between the positive electrodes 3 and 4. Thus the apparatus is adapted to work with greater certainty."

Passing, without discussion, the many details leading up to the conclusion, the patents come down to this: That the shield prevents a positive electrode from acting as a negative and compels it always to act as a positive, and thus control of the direction of flow of current is attained. The patents are concerned only with preventing or making "more difficult" the starting of the current flow in an undesired direction, and do not offer any guide as to how to control the amount of the current flow, during its existence. The expert testimony and the file wrapper inevitably lead to this conclusion.

Defendant's grid is not the shield of plaintiff's patents. The grid merely acts to vary the amount of current, and there is nothing for it to

act upon to prevent the starting or flow of an undesired current. The current flow in defendant's organization is the one desired flow between filament and grid, and this occurs whether the grid is present or not. Defendant's grid is not at the positive electrode, as contended by plaintiff, but nearer the negative electrode; but it makes no difference where it is.

The fact is that, except for some similarity in phraseology, and the further fact that the grid, as matter of words, might be called a shield, there is nothing in common between these two patents of plaintiff and defendant's devices, and, while the record is replete with elaborate expert exposition, this branch of the case seems fairly simple. Not only have these two patents been of no practical service in this art, as against the undoubted utility of defendant's devices, but it is plain that, giving them their fullest academic value, they have a different object, principle, mode of operation, and result from these which characterize the audion type of repeater used by defendant.

Were the case one of patentability, it could not be successfully contended that those two patents anticipated or negatived invention as applied to defendant's devices; and, by the same token, infringement, though asserted, cannot be sustained. Highly meritorious as have been many of the contributions of plaintiff to the practical arts, defendant has not in any manner used devices covered by the license between him and defendant, so far as relates to the patents herein considered.

Finally, it is, of course, impracticable to set forth in an opinion all the pros and cons of the expert discussion, but the effort has been to point out the outstanding features and the essential conclusions.

Defendant may have a decree dismissing the bill.