### HEWITT v. AMERICAN TELEPHONE & TELEGRAPH CO.

(Circuit Court of Appeals, Second Circuit. March 10, 1921.)

No. 47.

1. Patents ☞211(3)—Licensee is estopped to assert invalidity for narrow interpretation.

In a suit to enforce a license of patents which rests on contract, as distinguished from a suit to restrain infringement of a patent which is based on a continuing tort, the licensee is estopped to deny validity of the patents, and is bound to accord to them a benevolent interpretation.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. Patents ⬅️328—Licensee's amplifier held not to operate in accordance with patents, 781,001, claim 1, or 781,002, claim 3, for vapor amplifier.

The Hewitt patents, No. 781,001, claim 1, and 781,002, claim 3, for the means and methods of amplifying variable electric currents by introducing therein an inclosing gas or vapor conducting medium, do not cover an audion amplifier using the De Forest grid, though a minute quantity of air is left through which the variable current passes, and therefore the owner of those patents is not entitled to royalties on the audion amplifier used by a licensee, who agreed to pay royalties on devices operating in accordance with the patents.

3. Patents ⬅️328—Licensee's amplifier held not to operate in accordance with 1,120,949, claims 1, 7, 11, 13, 18, 19, or 1,121,359, claims 2–4, for a shield for a rectifying current.

The Hewitt patents, Nos. 1,120,949, claims 1, 7, 11, 13, 18, 19, and 1,-121,359, claims 2–4, the essential element of which is a shield charged with an electric potential inserted in a vapor conductor near one electrode for the purpose of resisting the establishment of a current in one direction and thereby rectifying an alternating current, do not cover an audion amplifier in which there is a grid alternately charged for the purpose of affecting the electric field between the filament and the plate for the purpose of amplifying a variable current, so that a user of the amplifier is not required to pay royalties to the patentee under a license requiring him to pay such royalties for any device operating in accordance with the patents.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by Peter Cooper Hewitt against the American Telephone & Telegraph Company. From a decree dismissing the bill (272 Fed. 194), plaintiff appeals. Affirmed.

Jurisdiction depends upon diversity of citizenship, and suit is brought to establish and declare Mr. Hewitt's rights as against the American Company under an admitted written contract between the parties hereto. In and before 1913 plaintiff was well known as an inventor in the electrical field, while defendant controlled much, if not most, of the telegraph and telephone system of the United States.

Defendant then had, and still maintains, what may be called a laboratory for the development, if not the invention, of apparatus designed for the improvement of such systems. Therefore, evidently believing that Mr. Hewitt had possibly already invented, or might thereafter invent, devices suitable for its purpose, defendant, after some preliminary negotiation (which seems to us immaterial), obtained from Hewitt the written agreement (hereinafter called the license) out of which this action grows.

This document, dated 15th December, 1913, recites that Hewitt had already obtained certain enumerated patents, and that defendant desired "to utilize said inventions," wherefore Hewitt granted to defendant "the right and license to make or cause to be made for it and to use, in telephone or telegraph systems employing wires or metallic conductors, connecting stations, gas or vapor and so-called vacuum electric apparatus for creating, transmitting, receiving, relaying, repeating, modifying, amplifying or boosting telephonic or telegraphic electric currents, waves or impulses, or * * * for lightning arresters, or strong current discharger or protector, or charge or voltage limiters, embodying, or made or operating in accordance with any and all inventions which he has heretofore made. * * *" Hewitt further agrees that "as and when, up to January, 1921, he hereafter makes inventions (of the same general nature) he will upon filing application for patent for any such invention" disclose the same to the defendant, and if the defendant so elects it shall have "with reference to such inventions the license above expressed to the end of the terms of the United States patents to be granted upon the sever-

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

al inventions so disclosed." The contract then provides for royalties upon such of Mr. Hewitt's inventions above described as the defendant might employ or utilize.

The bill charges, inter alia, that among the patents as to which defendant became a licensee under the contract of 1913 are Nos. 781,001 and 781,002, which patents were in existence and are specifically enumerated in the license, and also patents Nos. 1,120,949, and 1,121,359, which last two patents grew out of an application filed January 20, 1905, and which after division were finally granted December 15, 1914. The bill continues that under said license defendant was bound to furnish at stated intervals to plaintiff information as to (substantially) the use which it made of Hewitt's inventions, and that it had refused or neglected to furnish said information, to state the number of its "installations" upon which Hewitt's royalties in part depended, and generally had "refused to recognize the validity of plaintiff's patents as applied to devices defined by" said license. Wherefore discovery, definition of plaintiff's rights, and an accounting were demanded.

The answer, coupled with admissions of counsel, reduced the issuable matter of the bill to one question, viz.: Whether a certain device made and used by defendant, and known both technically and commercially as the "audion type of telephone amplifier," did or did not (in the language of the license) "operate in accordance with" claim 1 of 781,001, claim 3 of No. 781,002, claims 1, 7, 11, 13, 18, and 19 of No. 1,120,949, and/or claims 2, 3, and 4 of No. 1,-121,359. Thus the case became one of infringement, except as that word may be somewhat inappropriate in proceedings against a licensee, and it has been tried and argued as one of infringement.

The two earlier patents enumerated are respectively for "means for amplifying electrical variations" and "a method of amplifying electrical variations." The disclosures are substantially identical, and reveal that the invention grows out of or rests on the fact that in certain patents still earlier Mr. Hewitt had "called attention" to the phenomenon that the "resistance of an inclosed vapor or gas carrying current in an electric circuit varies inversely with the current carried by the vapor." Therefore it is said that, "if a varying potential be applied [to an apparatus of the nature described in said earlier patents], a variation of current will take place in the enclosed gas or vapor and this variation of current will affect the entire circuit in which the apparatus is included."

Consequently into a circuit adapted for telephony the patentee introduced a device such as had been described by him in his said earlier patents relating to "gas or vapor electric lamps," but not necessarily having the light-giving quality. Variations of potential being introduced into this circuit, the changes of resistance in portions of the circuit other than the lamplike vapor device "bring about such variations of conditions (in the lamplike vapor adjunct) as to augment the variations of current flow throughout the entire circuit."

On this disclosure rests claim 1 of the means patent, as follows:

"1. The combination in an electric circuit, of a source of potential variations, a receiving apparatus adapted to translate the variations caused by the source, and an inclosed gas or vapor conducting medium."

And also claim 3 of the method patent:

"3. The method of amplifying energy variations caused in an electric circuit including an inclosed conducting gas or vapor and electrodes therefor, which consists in affecting the conducting gas or vapor by variations of current, and thereby transforming such variations into corresponding amplified variations of current."

Both of the later patents (arising out of the same original application) are described as covering "controlling means for vapor apparatus"; but the claims in suit of 1,121,359 are all for a method and that alone. Both patents are said to arise out of the following state of fact: "In a vapor electric device comprising a suitable containing vessel and two or more electrodes with an intervening vapor, independent resistances manifest themselves at the electrodes and in the vapor. In previous applications I have disclosed means for modifying the resistance to starting which resides at the negative electrode by a

starting band, by which means the electrical potential required to start the lamp could be reduced or increased." It is then stated as the object of invention: "To render more difficult the starting of a current into an electrode which for the time being may be negative; that is to say, to strengthen the normal initial resistance to starting at a negative electrode."

The patentee, it is said, had concluded from study of the kind of apparatus above indicated "that the vapor close to a negative electrode interposes between the said electrode and an electrode which is positive to it—a dielectric condition which can be further increased by inducing a greater charge than that which the electrode itself would induce." Therefore he proposes to utilize this principle "by surrounding an electrode or electrodes of a vapor apparatus or other vapor device with a shield capable of receiving a charge that will augment or assist the charge which would naturally be present at a negative electrode."

On the disclosure thus summarized Mr. Hewitt rests the numerous claims of the means patent (1,120,949) of which it is sufficient to quote No. 1, as follows:

"1. In an evacuated electric apparatus, a container, electrodes therefor, and a shield at one electrode, and means for charging the said shield independent of the conductor leading to said electrode."

And No. 13, which, abandoning the word "shield," speaks of that thing as a conductor. It is as follows:

"13. The combination with an evacuated chamber, two electrodes and a conductor within the chamber, the conductor being of a polarity opposite to that of one of the electrodes, an electric circuit connected with the two electrodes and means for charging the conductor electrically."

In the disclosure for both the later patents it is pointed out that the action of the shield device "is not essentially that of current flowing, but more nearly that of capacity charged to the required potential," and this thought seems to have been present in the framing of the claims in suit of the method patent (1,121,359) of which No. 4 is perhaps the most specific, and is as follows:

"4. The method of increasing the resistance to starting at an electrode which is negative with relation to another electrode in a vapor electric device, which consists in inducing at the said electrode a normal charge by the application of current to the terminals of the device and also inducing a vapor charge higher than the charge thus induced."

After a protracted trial in open court the trial judge concluded that "defendant has not in any manner used devices covered by the license between plaintiff and defendant so far as relates to the patents" hereinabove referred to and described. Accordingly the bill was dismissed, and plaintiff took this appeal.

Drury W. Cooper, of New York City, for appellant.

Charles Neave, of New York City (Frederick P. Fish, George E. Folk, and William R. Ballard, all of New York City, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge. [1] The nature of the evidence produced, and method of presentation, has produced a somewhat misleading resemblance between this suit and the ordinary proceeding for infringement. It must, however, be recognized that the usual infringement suit is to restrain a continuing tort, while this is upon a contract, under which defendant is a licensee. Therefore it is admittedly estopped to deny validity, and bound to accord to plaintiff a benevolent interpretation of the patents under which license exists. This last statement is really but a corollary to the rule that invention is part of validity, and the obligation to admit invention practically limits the evidential

value of such prior art as may exist. With the foregoing admitted—and it has not been denied in argument—we perceive no question of law in this record. The thing said by plaintiff to "operate in accordance with" the claims above enumerated, is used as a relay in what is just at present the longest of long-distance telephony.

Defendant yields tribute to De Forest 841,387 (claims 4 and 6), and we are convinced that this relay is in fact a descendant of the "three-member device" there revealed by that patentee.[1] The relay shows an in-put circuit connected with the filament and grid, and an out-put with the filament and plate. The filament is independently heated, and both filament and plate as used by defendant and others, are older than the inventions of either De Forest or Hewitt.

"Grid" is a word perhaps coined by that well-known phrasemaker, De Forest; at all events it is called throughout this record the De Forest grid. Filament, plate, and grid are in practice inclosed in an evacuated tube exhausted to a pressure of the order of one hundred-thousandth of a millimeter. That pressure can be still further reduced, but such reduction is expensive and does not change or improve the working of the apparatus. The normal operation of this audion amplifier, with the grid located between filament and plate, is, according to the electronic theory, that a current consisting of negative carriers tends to pass from filament to plate because they, being negative, are attracted to the plate, which is positive. The rate of passage, and therefore the amount of current flowing, will depend upon how forcibly the positive plate attracts, and that depends upon the intensity of the electrical field acting in the space between plate and filament.

The grid acts (as testified by plaintiff's expert, and imitating Hewitt's specification language) as a capacity charged to a potential rather than as a current flowing; but, be that as it may, it is asserted by defendants that the transmitter on the in-put varies the potential impressed upon the grid, and the grid in turn similarly varies the electrical field between filament and plate wherein said grid is commonly located. Therefore the tendency of the negative carriers to pass from filament to plate increases or decreases according to the fluctuating of grid potential, and similarly varies the current flowing across said electrical field and into the out-put. The result as claimed by defendant is that "the action is due solely to the De Forest grid," and when the elements of the audion amplifier are properly (and from the evidence apparently empirically) proportioned and co-related, repetition and amplification take place without distortion, but always the work is said by defendant to be done by the properly placed and proportioned grid.

Plaintiff's contention may be summarily stated thus: (a) It is not the grid per se that does the work or accomplishes the result; for the nature of an atmospheric residuum in even so highly evacuated a tube as that of defendant either has something to do with it or produces a condition answering to the "vapor" of Hewitt's patents; but anyhow (b) the De Forest grid, if not in its original conception, at all events in re-

---

[1] The disclosures of this patent were considered in Marconi, etc., Co. v. De Forest, etc., Co. (D. C.) 236 Fed. 942.

spect of its use by defendant, is the Hewitt shield of the later patents above mentioned.

Much of this record is occupied with evidence pro and con as to whether the theory of operation advanced in the disclosures of 781,001 and 781,002 is not wholly erroneous; whether the devices there suggested are of any practical use; whether they constituted any real advance upon the prior art; and whether defendant did or did not utilize them, or either of them, in the construction of a mercury vapor amplifier which was made—allegedly under other patents of Hewitt not here involved, and on which plaintiff received royalties. We do not find it necessary to discuss this evidence, but prefer to ground decision as to the earlier patents on one proposition only.

[2] Plaintiff (or his counsel for him) contends that a vapor tube, a vacuum bulb, and an evacuated container all mean practically the same thing for the purposes of this case. He admits that when these patents were applied for, he was thinking in terms of those mercury tubes which have made him famous. But it was then true, and always will be true, that, as long as there is any residual air left in an evacuated container, that container incloses a vapor. Therefore it is as much a vapor tube for the purposes of the present discussion as if it were filled at a fairly high pressure with any of the numerous gases suggested in plaintiff's earlier specifications (not here involved). But the moment the vacuum becomes absolute, the vacuum space is a perfect dielectric, as we have all been taught—consequently, since defendant does not pretend to have an absolute vacuum, it must have a vapor tube.

As matter of definition, commercial usage, or of mere words, the contention may be right; we are not concerned to go further into it. Let it be admitted that per se defendant has a vapor tube; the question still remains whether its vapor has any such causal connection with what the audion amplifier does as Hewitt's vapor possesses in respect of the means or method of the claims at bar. This plaintiff never obtained a patent covering every amplifier that employed a vapor tube; at the most, his patents can only cover every vapor tube used to amplify by substantially the same means, or in substantially the same method, as Hewitt's amplifier. It is we think admitted, and, if not, it is proven, that when a vapor of anything like the order of pressure necessary for the operation of Hewitt's device be introduced into defendant's amplifier it will not and cannot work. Why this is so is the crux of so much of this litigation as rests on the earlier patents.

On such a point this court can pretend to do no more than to carefully weight all the evidence, and attempt to base decision on facts, and on facts as simple as the evidence permits. In this instance, however, we can find no satisfactory basis for judgment, except the electronic theory as expounded by defendant's expert, and not, we think, successfully combatted even in detail by plaintiff. Indeed, except for its application to the present case, plaintiff's expert is firm in the same faith; both regard the theory as the majority of men look upon the theory of the rotation of the earth.

As applied to this litigation, we find the fact to be that it is an essential part of the operation of the devices suggested by the earlier pat-

ents of plaintiff that the evacuated chamber must contain a gas or vapor capable of ionization; unless there be ionization, the devices will not work. Whereas defendant's audion amplifier does not depend for successful operation on ionization, and only succeeds when the vacuum is carried so far that ionization has no effect upon the operation of the grid and other parts contained in the tube. Consequently in respect of the earlier patents the decision below was right and is affirmed.

[3] As to the two later patents, the fundamental difference between the parties is as to what they are for. We agree with the defendant that the specifications suggest no utility or purpose in respect of either the means or method patent except that of rectifying, in a wide sense of that word—i. e., keeping straight; for even the modification suggested for direct current is evidently intended only to prevent a reversal in direction of flow. Nor does the expert evidence lead to any other conclusion.

Plaintiff's view may be thus stated: Hewitt's invention was the introduction into an otherwise old evacuated chamber of a separately charged piece of metal which he called a shield. Patents can neither be framed in such language nor supported by such generalizations. It is vital to inquire: For what purpose did plaintiff put his shield into the tube, and what did he say it was good for, and what was it good for, after it was in?

He put it there, as he repeatedly says, to increase the reluctance to starting, and his effort is to use such increase of what he calls reluctance to prevent the anode, or an anode becoming a cathode; that is, Hewitt's shield, as shown and described, is for the purpose of maintaining a flow of current steady in direction. The specifications have nothing to do with amplifying, as is admitted; wherefore plaintiff's argument must come to this: That that part of defendant's device called the grid is, when amplifying, performing substantially the same function in the same way as does plaintiff's shield when rectifying— not that Mr. Hewitt ever had any ideas on this point.

On the evidence we can only say we think this is not true. The whole object of the grid is to receive variations of potential which are by such reception impressed upon the output current; but plaintiff's shield cannot vary in any way the current flow between any two electrodes. Indeed, after prolonged study of this evidence, we fail to perceive any other resemblance between plaintiff's shield and defendant's grid, except that they are both pieces of metal and both inserted into evacuated chambers.

We have not overlooked the long series of experiments conducted before the lower court, but described with the aid of diagrams and photographs in this record. They may be summed up thus: Amplification for telephonic purposes may be accomplished with a mercury vapor (or other similar gas) apparatus, but none of the apparatus produced by plaintiff failed to depend for whatever measure of success it attained either upon ionization, or a radical departure from anything disclosed, or upon both.

Decree appealed from is affirmed, with costs.