**BAKER OIL TOOLS, Inc., v. BURCH.**

**BURCH v. BAKER OIL TOOLS, Inc.**

Nos. 872, 873.

Circuit Court of Appeals, Tenth Circuit.

April 17, 1934.

Rehearing Denied May 28, 1934.

William A. Loftus, of San Francisco, Cal. (Charles E. Townsend, of San Francisco, Cal., John H. Cantrell, of Oklahoma City, Okl., and Biddison, Campbell & Biddison, of Tulsa, Okl., on the brief), for Baker Oil Tools, Inc.

Edward P. Marshall, of Tulsa, Okl. (J. J. D. Cobb, of Tulsa, Okl., and John H. Bruninga, of St. Louis, Mo., on the brief), for Donald D. Burch.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

Baker Oil Tools, Inc.,[1] appeals from a final decree awarding Burch $26,336.30 royalties for cement float shoes, and $32,104.10 for cement float collars, found to be due under a license of the inventions embodied in Burch's patents and improvements thereon. Burch appeals·from that part of the decree canceling the license as of September 12, 1932. The court also reformed the contract in certain particulars, but no error is assigned to that part of the decree. Royalties were paid on the float shoe from the date of the contract until September 3, 1930; no royalties were ever paid on the float collar.

A controversy exists between the parties as to the nature and scope of the action. Baker contends that, save for the prayer for reformation, it is a straight suit on the license agreement, and that the issue is a narrow one: Is it manufacturing devices which infringe Burch's patents or improvements thereon patented by Burch? Burch contends, and the trial court held, that while the relief sought was the recovery of royalties under that agreement, the issues were whether, under all the facts pleaded, Burch was entitled to equitable relief measured by the prescribed royalties. When this controversy is determined, many of the questions argued, particularly as to the admissibility of evidence, will be answered.

1. *The Pleadings.* The bill in equity alleges the license contract and the subsequent modification of the royalties at the request of Baker; that Baker induced Burch to apply for a reissue of the patent described in the contract, and to employ counsel of Baker's selection for that purpose, in order more adequately to protect devices manufactured under the license; that Baker represented that by so doing, complete patent protection could be secured; that devices were manufactured and sold to the public for more than three years under the name of Burch and protected by such patent and his application for patent described in the contract; that Baker paid royalties on the shoe, and led Burch to believe the collar was covered by the license agreement, "until after defendant itself, or someone for its benefit and account, had applied for and secured a patent or patents covering said float invention and design, using plaintiff's inventions, designs, conceptions and ideas in developing said invention and design, whereupon defendant disclaimed any duty under said contract and amendment thereof to account for any pay royalties upon said float collars manufactured and sold by it under said contract, theretofore neglecting and wilfully omitting to inform plaintiff, who was at all times unlearned in law and patent matters and was dependent upon defendant for advice as to steps needful to be taken to protect his patent rights, of which defendant knew, of any deficiency in his aforesaid patents in respect to a right to monopoly of manufacture and sale of float collars embodying his inventions and designs, or those in substance, all in gross fraud of plaintiff, wherefore defendant is now precluded from asserting that it is not obliged under the terms of said license agreement, as amended, to account to and pay plaintiff the royalties thereon specified thereby."

The prayer is for an accounting "and such further, other and additional relief as he may be entitled to have and receive in equity and good conscience."

The answer admits that Baker at its own expense endeavored to secure broader protection for all concerned by a reissue of Burch's patent, and that Burch cooperated to that end, but that the reissued patent did not cover the devices manufactured by Baker. Baker admits it marketed the shoe under Burch's name, but denies that it was protected by his patent. It alleges that the royalties it did pay were paid by mistake, and counterclaims therefor. Baker alleges that the device it manufactures "is an independent invention developed at considerable expense by defendant."

The answer specifically denies that Baker "obtained a patent or patents covering any invention or design using plaintiff's inven-

---

[1] The corporation will be herein referred to as Baker; its President as Mr. Baker.

tions, designs, conceptions and/or ideas, and particularly denies that it committed any gross or other fraud upon plaintiff in respect to the matters therein referred to."

By way of counterclaim, Baker alleged that it attempted to manufacture practical devices under Burch's patents without success; that numerous changes and alterations in the device were made by Baker before a satisfactory article was produced; that "these changes and improvements" were patented by Baker.

In reply, Burch alleged that he cooperated in making the changes and alterations of his invention, under Baker's representation that the changes were for their mutual benefit, and that Baker is estopped to claim adversely under the patent which Mr. Baker took out secretly in his own name.

This sketch of the pleadings is sufficient to show the error in Baker's contention that the only issue is whether it is manufacturing devices which infringe Burch's patents. That contention requires us to reject, as meaningless surplusage, all but a few lines of these elaborate pleadings. To say no more, the pleadings disclose a mutual effort to improve upon Burch's basic idea, undertaken under the representation that the results would inure to the benefit of both, and a wrongful appropriation of such results by Baker to its exclusive use. Such averments were denied, and constitute an issue to be tried, and the trial court properly admitted all evidence bearing upon the issue, not to alter or modify the license agreement, but to determine who was entitled, in equity, to the improvements brought about by their mutual efforts, and appropriated by Baker to its exclusive use.

2. *The Facts.* In the drilling of oil wells, it becomes necessary to lower long strings of heavy casing into the well, and to introduce cement or concrete between the casing and the sides of the hole. The weight of a long string of casing puts a tremendous strain upon the derrick and the joints of the casing. In order to relieve that strain, it has been the practice for many years to float the casing into the hole, using the buoyancy of the water or mud with which the hole is filled, to help carry the weight of the casing. This requires a plug in the bottom of the casing which can be drilled out when the casing is set, so that the sands below the casing may be reached. Such plug or "casing shoe" is old in the art. When it is desired to cement around the casing midway its length, to shut off water or for other purpose, a device employing the same principle is used, called a "collar."

The shoe or collar must be equipped with a valve, which will open when the casing is set, to permit the cement, pumped down through the casing, to flow into the crevice between the casing and the sides of the hole. The use of such a valve in a casing shoe or collar was old. Prior to Burch, the valves used were of the poppet type, actuated by a spring, and the shoe itself was composed of metal. The difficulty with such construction was that in drilling out the shoe or plug for the purpose of further drilling or pumping, the metal did not pulverize readily. A shoe or collar and valve constructed of a more friable material would have distinct advantages.

Burch was a practical oil man, living in Oklahoma. For some time he had been working on this problem. On February 15, 1926, he applied for a patent on a device which disclosed a shoe of soft metal, inside of which was a chamber and a ball valve. Conduits from the chamber to the exterior of the casing are provided. As the casing is lowered, the pressure of the water coming through these conduits forces the ball valve down, which closes other conduits leading into the inside of the casing. When the casing is set, the cement is pumped in through the latter conduits which forces the ball valve upward, and permits the cement to flow out through the other conduits. The chamber is closed except for the conduits which enter the sides of the chamber. Patent 1,603,447 was issued October 19, 1926, to Burch. Ball valves are common property, and their use in oil drilling tools to shut off fluids was disclosed by patent to Macomber, March 3, 1926, 1,577,740.

On June 21, 1927, Burch applied for another patent which disclosed a cast concrete plug, with a chamber, ball valve, and plurality of conduits. The drawings disclose eight curved conduits. Burch had some of these devices constructed. Patent to Miller, March 28, 1922, 1,411,057 disclosed a cement plug in casing below a perforated section through which cement might be distributed to the exterior of the casing.

Baker Oil Tools, Inc., a California corporation, were large manufacturers and distributors of oil well supplies. It controlled the McLaine patent, 1,491,915, which broadly claimed a casing shoe with valve means through which cement might be forced, formed of friable cast iron. The drawings

disclose a poppet valve actuated by a spring. On May 11, 1927, Mr. Baker, President of Baker Oil Tools, Inc., applied for a patent on a cementing and floating shoe, issued September 25, 1928, 1,680,307. That application discloses a poppet valve and plug in a shoe of "comparatively indestructible material," and contains no hint of Burch's conception of a ball valve in a concrete shoe.

About June 23, 1927, Mr. Baker and Burch met in Oklahoma. This was but a few days after Burch had applied for his patent disclosing a ball valve in a concrete plug, and but a few weeks after Mr. Baker had applied for his patent on a poppet valve in a comparatively indestructible plug. Mr. Baker was keenly interested and asked Burch to show him drawings or models of his idea. Burch did so, but told him that he "had not had time to perfect it, had not experimented with it in wells enough to know exactly what it would amount to, but if I gave it to anybody they would have to work the bugs out of it, experiment with it, probably perfect, because it was in the crude stage at that time, but I would show him as far as I had gone." Burch explained that he had designed it to be made of cement, and the ball to be of material other than metal, so it could be drilled out without difficulty. Burch told him the same idea could be used in float collars.

After these conversations and disclosures, the license agreement was signed on June 30, 1927. Burch granted Baker an exclusive license to manufacture, sell, and sub-license "inventions of the aforesaid Letters Patent of the United States and the aforesaid application for Letters Patent of the United States and any improvements thereon." Burch also agreed to license "any and all improvements on said inventions as may be subsequently devised by said licensor," and to disclose any such improvements upon conception. For which Baker agreed to pay Burch "a royalty equaling fifteen per cent (15%) of the wholesale price for each device embodying the invention, aforesaid, as defined in said United States Letters Patent, or any United States Letters Patent which might hereafter issue on said invention or improvements thereon." The agreement gave Baker the right to prosecute infringers, and provided that the agreement should end if the patents were declared invalid by a court of competent jurisdiction. Baker reserved the right to cancel the agreement after three years "by notice in writing."

Mr. Baker then asked Burch to dismiss his attorneys and let the company complete the application through the company's patent counsel. Burch did this, and thereafter Burch's application was followed to patent, and his first patent reissued, under the guidance of Baker's patent counsel.

Burch shipped Baker one of the devices which he had made up, but which, without Burch's knowledge, contained considerable metal. Then started an effort to construct a device, embodying these ideas, which would be practical—"to work the bugs out of it." Baker's engineers were working on it, and shoes and drawings were sent to Burch for his suggestions and advice. Burch cooperated throughout the summer in this development work. Burch's eight conduits were too many for smaller casing, and too apt to clog up; one inlet and four outlet conduits, not curved, would serve if the ball seated upwardly instead of downwardly as the casing was lowered. That change was made. Experimentation in the material for the construction of the ball was going along simultaneously. On November 2, 1927, Baker advised Burch that "we have finally licked our assumed task of making a cement shoe without any metal whatever." In the same letter Burch is notified that the Baker Company had paid the attorneys "for taking over the work of broadening the patent." On December 8, 1927, this device was offered to the public as the "Baker-Burch Cement Float Shoe," and royalties were paid Burch.

Burch was kept in touch with this experimentation in the form of the device; the correspondence clearly shows that such experimentation was to perfect the device which Baker was to manufacture under the license; otherwise there was no excuse for seeking Burch's assistance.

Meanwhile, Baker's patent counsel,[2] employed by Burch at Baker's request, were presumably getting as broad protection for Burch as they could, both in pursuing his application to patent, and in a reissue of his first patent.

Burch was not advised that as soon as the device was ready for the market, and on November 23, 1927, Mr. Baker, through the same counsel, applied for a broad patent on the device which was evolved from the summer's efforts of Burch and Baker and the subject of the correspondence between them, in his own name. This application was broad enough to embrace the collar.

---

[2] A firm in the general practice of patent law, but who handled Baker's patent matters regularly.

Although making no mention of that incident, Baker advised Burch on January 24, 1928, that

"We believe that you appreciate that Mr. Mellin [3] is acting under instructions from us to do everything possible to strengthen your patents and that whatever is done will be to your advantage as well as ours and we hope that you will cooperate with Mr. Mellin, so that he can have the application for the reissuance of the patent on file at Washington before February 25th.

"Trusting that we may count on you to facilitate the work of securing a re-issue of your first patent and assuring you of our desire to protect your best interests along with ours, we wish to remain."

On May 31, 1928, Baker charged Burch's account with fees of patent counsel.

In May, 1929, the device was further simplified by merging the four outlet conduits into one. That is the device now being marketed. No change in the device was made, except to eliminate the Burch name, after Baker quit paying royalties.

The device was so successful that by 1931, three out of every four shoes sold by Baker were of the type advertised as the Baker-Burch. Competition threatened at times, but competitors were notified that they were infringing the Burch patents. The Larkin Packer Company boldly challenged Baker's monopoly and the Burch patents and litigation commenced. A settlement was effected, and one of the arguments used in bringing it about was that Larkin infringed the Burch patents. Larkin discontinued the manufacture, and neither Burch patent was "declared invalid by a court of competent jurisdiction" as provided by the license contract.

On January 20, 1928, Baker advised Burch that it was necessary to pay McLaine some royalties on account of his broad patent, and asked for a reduction in royalties. The first paragraph of that letter reads:

"We are enclosing herewith a schedule which we propose to use in computing royalty payments to you on 'cement plugs,' whether such plugs are used in a casing shoe or float collar."

Burch demurred and Baker wired "we thought by paying you royalty on cement plugs whether used in shoes or couplings you would get maximum returns."

The royalties proposed by Baker, on shoes and collars, would have paid Burch $3.86 each for the two devices of the 4½" size, or $7.72 for the two. Burch refused this, but after personal negotiations in California, did agree, on February 16, 1928, to an amendment to the royalty clause of the contract, by which Baker agreed to pay "a royalty for each device embodying the invention aforesaid, * * * or improvements thereon" according to a schedule attached. That schedule, on the smaller sizes, was $4.00. Baker then declined to pay any royalties on the collar, claiming the amendment excluded them, and did not sell them under Burch's name.

Mr. Baker's application on this device went to patent February 18, 1930. Larkin discontinued its competition in the summer of 1930. No other competitor threatened. The device had absorbed the greater part of the demand. The monopoly seemed complete and recognized. Thereupon Baker quit paying royalties, claiming that Larkin had convinced Baker that it had been mistaken from the start; that notwithstanding that Baker's patent counsel had been in full charge, Baker was misled about the protection afforded by the Burch patents. This suit followed.

■ 3. *The Casing Shoe.* Much is said in the briefs on the question of whether Burch is entitled to royalties on devices embodying improvements patented by others, or only on improvements patented by Burch. The question need not be answered. If the devices being manufactured embody Burch's invention, royalties cannot be escaped because Baker likewise avails itself of improvements thereon, no matter who owns the improvement patents. Temco Company v. Apco Company, 275 U. S. 319, 48 S. Ct. 170, 72 L. Ed. 298; Walker on Patents (6th Ed.) § 432.

■■ Baker, holding a license from Burch, is estopped to deny the validity of the Burch patents. Swan Carburetor Co. v. General Motors Corporation (D. C. Ohio) 42 F.(2d) 452, affirmed (C. C. A. 6) 44 F.(2d) 24; Hewitt v. American Telephone & Telegraph Co. (D. C. N. Y.) 272 F. 194, affirmed (C. C. A. 2) 272 F. 392; Eureka Company v. Bailey Co., 11 Wall. 488, 20 L. Ed. 209. A licensee, however, may explore the prior art for the purpose of ascertaining the breadth of the claims of the patent licensed. Westinghouse Co. v. Formica Co., 266 U. S. 342, 45 S. Ct. 117, 69 L. Ed. 316. A licensee who is manufacturing or marketing a device which does not embody the invention of the licensed patent, fairly construed in the light of the prior art, need not pay royalties in the future

---

[3] Mr. Mellin was one of the patent counsel employed by Burch at Baker's request.

simply because it mistakenly and needlessly paid royalties in the past. Dodge Mfg. Co. v. Patten (C. C. A. 7) 60 F.(2d) 676; Hunt v. Moline Plow Co. (C. C. Ill.) 52 F. 745.

■ The trial court did not construe the precise scope of the Burch patents in order to determine whether there was an infringement. We see no need of doing so now, although our examination into the prior art convinces us that the use of cement and ball valves in the drilling of oil wells was known, and the field of casing shoes and collars a crowded one. A liberal construction cannot be accorded the Burch patents; yet, being concededly valid, they are entitled to some, albeit a narrow, range of equivalents. We note also that the device manufactured accomplishes the same purpose as taught by the Burch patents, with the means of cementitious material and a ball valve disclosed thereby; the changes are structural only, designed to simplify by substituting two conduits for the eight disclosed by the Burch drawings. It may be noted that Burch does not claim eight conduits, claim 1 of Patent 1,712,948 reading in part:

"The control element comprising a casing, a conduit communicating with the upper end of the casing and extending downwardly through the bottom of the plug, a second conduit communicating with the bottom of the casing and extending upwardly through the top of the plug and a downwardly seating check valve controlling communication between opposite ends of the casing."

■ If the device manufactured embodies this invention, with a colorable change only, or embodies this invention as improved by Baker or others, the royalties must be paid. Escape there is for Baker only if, as it contends, the device manufactured does not embody the invention at all, but embodies one of a different species, although in the same field. We do not decide the point, because it is conceded that the devices manufactured read on the claims of Mr. Baker's patent 1,748,007, and we are convinced that Burch is entitled to the benefit of the protection afforded by that patent.

■ It must be remembered that we have here more than the ordinary license contract. That contract was but a part of the agreement made. National Wire Bound Box Co. v. Healy (C. C. A. 7) 189 F. 49, 57. Before Burch dealt with Mr. Baker at all, and at the time he disclosed his drawings and models, he stated he would deal with no one who would not agree to develop the device, "get the bugs out of it" by experiment. With that statement, the license agreement was entered into. An implied, if not express, promise was thereby made to develop the idea. Burch agreed to and did cooperate in the development; he dismissed his own counsel and employed Baker's. Together they developed it, Baker supplying the technical knowledge and Burch the practical experience, in pursuance of Baker's agreement.

When it was perfected, Burch's claims were not broadened to embrace it beyond the point of argument; instead, Mr. Baker procured a patent on it in his own name. No reason is apparent why as broad protection could not have been secured for Burch, the casual client, as was secured for Mr. Baker, the regular client. Counsel may not have known the broad application they successfully pressed to patent for Mr. Baker, claimed the evolvement of the Burch device, but Mr. Baker knew it. Counsel may not have perceived a clash between the interests of the two clients; the restricted claims eventually allowed Burch, and the broad claims allowed Mr. Baker, may not have resulted from that clash. But Baker, having induced Burch to dismiss his own counsel and employ Baker's, may not profit by that circumstance at Burch's expense. Mr. Baker had no right to apply for a patent embodying the basic idea disclosed by Burch, as improved in accord with their agreement.

In equity and good conscience, Burch is entitled to any protection afforded by Baker patent, 1,748,007. The ball valve in a cement plug idea was Burch's, and not Mr. Baker's; Mr. Baker had applied for a patent for a casing shoe a few weeks before he met Burch, along the old idea of a poppet valve in a metal plug. He met Burch, was shown the drawings and a sample embodying the new idea, and took it over under an agreement, implied if not express, to eliminate objections that might stand between the sample and a practical device for the trade. More than that, he asked that counsel of his selection should be engaged by Burch to get broad patent protection for Burch. By so doing, Baker became more than a bare licensee; the confidence and trust reposed in Baker and its patent counsel by Burch, Baker's acceptance thereof, and the agreement then made to improve the device, later carried out, created a fiduciary relationship between them. On well settled principles, Baker cannot turn that relationship to its personal profit by an appropriation of the fruits of the relationship. Concealing the appropriation from

Burch does not confirm its title. This fundamental rule of equity and good conscience has been applied to patents. *Ambler v. Whippe*, 20 Wall. 546, 22 L. Ed. 403; *National Wire Bound Box Co. v. Healy, supra*; *Allen-Qualley Co. v. Shellmar Products Co.* (D. C. Ill.) 31 F.(2d) 293, affirmed (C. C. A. 7) 36 F.(2d) 626; *Moto Meter Co. v. National Gauge & Equipment Co.* (D. C. Del.) 31 F.(2d) 994; *Walker on Patents* (6th Ed.) § 332. Judge Hare, in his note to 1 Leading Cases in Equity, 62, lays down this rule, applicable here:

"Wherever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or the law, that he becomes interested for him, or interested with him in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interest he has become associated."

Burch is therefore entitled to recover if the devices now manufactured embody the invention of Mr. Baker's patent. While Mr. Baker's drawings disclose four exit conduits, his claims are broad; for example, claim two reads:

"A floating device for well casings comprising a tubular member adapted to be connected to a well casing, a plug of cementitious material cast within said tubular member and inseparably united therewith, a passageway formed centrally and longitudinally through said plug, a valve seat in said passageway, and a valve member buoyant in fluid cement cooperating with said valve seat, said valve being adapted to permit fluid to be discharged downwardly through said passageway but not in the opposite direction."

The devices now manufactured read squarely on this claim.

In addition to all this, there is the undisputed fact that Baker used the Burch patents, through the first three critical years, to frighten off competitors and to build up a business that now approaches a monopoly. Having done this, with full and exact knowledge of the patent situation, it may not cast Burch off when it conceives that his patents have served their purpose. During these critical years, Baker's conduct deprived Burch of an opportunity to market his patents with other manufacturers. The language of Circuit Judge Denison in *Miami Cycle & Mfg. Co. v. Robinson* (C. C. A. 6) 245 F. 556, 565, dealing with a patent situation closely analogous to the case at bar, is apt. He said:

"To permit the company now to say that this patent does not cover its product would be to allow it to repudiate the whole theory upon which it dealt with Robinson for years and which it allowed him, if it did not lead him, to accept as the basis of their continuing relations."

4. *The Collar.* The collar differs from the shoe in that the shoe is used at the end of a string of casing, and a collar elsewhere in the string. Both perform similar functions by the use of the ball valve in a cement plug. Both are "devices" as used in the contract and the amendment. It is claimed that Burch's patents read only on a shoe. A short answer is that Mr. Baker's patent clearly covers collars as well as shoes, a detail overlooked by counsel when perfecting Burch's patents; Burch is entitled to royalties therefor, for the reasons heretofore stated at length. Furthermore, Baker in its correspondence clearly acknowledged Burch's right to royalties on collars until the amendment of February 10, 1928. If that amendment does not cover collars at the lower rate, as Baker now claims, then Burch is entitled to royalties under the original contract at the higher rate. But the negotiations clearly show that the parties contemplated that the amendment should cut down the amount of the royalties only, and not their coverage. Sane sellers do not reject an offer of $7.72 for the purpose of inducing buyers to pay $4.00.[4]

5. *Other Errors Assigned.* If this suit were on the license agreement alone, as Baker contends, the preliminary negotiations would be merged into it, and evidence thereof immaterial. But the issues are not that narrow, as we have heretofore ruled. The license contract was but one part of the agreement entered into; the agreement was to develop an idea confessedly in the rough, procure as broad patent protection therefor as possible, and then to manufacture and market the device under the license agreement. Other errors assigned do not warrant discussion.

6. *The Cross-Appeal.* Paragraph 12 of the license contract, as reformed, gave Baker the right to cancel the agreement after

---

[4] See cases gathered on construction of contracts in *Champlin v. Commissioner*, 71 F.(2d) 23 (C. C. A. 10) (filed April 10, 1934).

three years by "a notice in writing." No such notice has been given. On the stand, Mr. Baker testified:

"Q. By Mr. Loftus: Are you willing now and do you offer to cancel or surrender this license agreement?

"A. Yes, sir; he can have it any time he wants it."

This testimony is not a notice in writing. It is an offer to cancel if Burch wants to. Burch does not want to. The license is not canceled by such an oral unaccepted offer. There is neither pleading nor proof to justify its cancellation by court decree.

It follows that the final decree should be modified by striking out the paragraph canceling the license agreement as of September 12, 1932; in lieu thereof, the decree should adjudge that Burch is entitled to royalties, as provided by the license agreement, as amended, on all devices embodying the invention of the Burch patents, or of Baker patent 1,748,007, or improvements thereon, as long as said license agreement remains in effect. Otherwise, the decree is affirmed. The rights of the parties, after a cancellation of such agreement, are not now before us and are not adjudicated. Costs on both appeals will be taxed against Baker.

The decree, as far as assailed in No. 872 is affirmed; as far as assailed in No. 873, it will be modified as indicated herein.