**REDDI–WIP, Inc. v. KNAPP–MONARCH CO.**

No. 8247(2).

United States District Court
E. D. Missouri, E. D.
March 28, 1952.

Jones, Hocker, Gladney & Grand, and Lon Hocker, and Jerome A. Gross, all of St. Louis, Mo., for complainant.

Shepley, Kroeger, Fisse & Ingamells, St. Louis, Mo., Will Freeman and George E. Frost, Chicago, Ill., for defendant.

HULEN, District Judge.

This is a contest to determine the patentable interest of plaintiff and defendant in a valve used in a container to dispense whipped cream for consumer use.

Defendant, with the assistance of one of plaintiff's [1] officers, developed the valve, in the usual course of its business, concededly with the understanding that if the structure was successful, defendant's cost and profits would come from sales of the device to plaintiff. During the course of work it developed the cost to plaintiff would be excessive and the parties then agreed plaintiff would (and did) pay defendant $8,000 for the use of defendant's research facilities in the work done to that time. Defendant described the compensation as payment in "assisting" plaintiff to "develop a valve". Plaintiff was given the privilege of having the valve made elsewhere, the $8,000 to be paid from sales on a stipulated basis. Plaintiff succeeded in its promotion, using the structure developed in defendant's shop, with minor changes. At the time the $8,000 payment was agreed to nothing was said about patent rights. Each of the parties now seeks a patent. Interference has been declared and is pending in the Patent Office. Defendant now questions plaintiff's right to use the valve because of alleged superior patent rights in defendant.

The complaint seeks equitable relief, plaintiff claiming to be the sole owner of the valve design, the equitable owner of defendant's patent application. The complaint prays for a mandatory injunction requiring defendant to assign the patent application filed by it to plaintiff, and enjoining defendant perpetually from asserting any claim based on the device for which each party now applies for a patent.

In the summer of 1946 A. S. Lapin, president of plaintiff, approached defendant on the subject of "a bottle to sell and distribute" a filled milk product. Lapin was at that time president of Sta-Whip Company, Inc., which was interested in such a container. In 1947 Lapin originated an idea to sell whipped cream in a disposable container. He consulted defendant again. A part of defendant's business was to work out designs, models, and perfect and manufacture structures of the nature Lapin had in mind. Defendant had done some work on a similar design, but for a refillable container.

Lapin, as president of Sta-Whip, wrote defendant in September, 1947 (Plaintiff's Exhibit 7) as follows:

"In conformity with our personal visits with you and conversations over a period of the last two years, in which we asked you to develop a dispensing head for a contemplated whipped cream throw-away can dispenser, please be advised that the samples which you have submitted have certainly been in line with our thinking and acceptable for our purpose.

"In accordance with the above, and for the consideration in time and effort put upon same, we are anxious to see that you grant us, the Sta-Whip Company, Inc., the exclusive right to purchase such heads from you for the use of whipped cream, as well as other edible food products which we may from time to time develop or co-operate in developing with other people.

"It is of course understood that this dispensing head and all attachments thereto which may be developed will be sold to no one else for purposes outlined above except our company, and therefore we are so advising you so that we may have the protection of such exclusive right granted into our company.

"We would appreciate your acknowledgment of this letter for our files,

---

1. We use the term "plaintiff" as including the parties who negotiated with defendant and afterward formed plaintiff corporation and succeeded to all the rights and liability of its predecessors.

and therefore are writing you so that we can go on record as to the above requests.

"We understand that there will be no patent infringements of patent rights in the use of this dispensing head as purchased from you."

Defendant replied to the letter (Plaintiff's Exhibit 8):

"I wish to acknowledge your letter of September 22nd in which you request an understanding that we agree to sell the dispensing head our Engineers have developed for dispensing Whipped Cream, etc. to no one for such purposes other than your concern.

"This dispensing head which we have developed is based upon previous applications of the same principal that have made in our Sparklet and Aerosol field.

"It is our intention to give you an exclusive on this head for your field which we understand to be the packaging of whip cream and other edible foods for a self dispensing container. We cannot of course exclude the possible use of a similar type of head on a refillable unit, inasmuch as we have our own Sparklet refillable field to consider and have previously put out such items in this field. It also must be pointed out at this time that if for any reason you don't go ahead with this thing in the manner outlined, we expect to be free to cash in on the time and money we have already invested in this device.

"However, granted that we do go forward on the basis outlined, we see no reason why we cannot limit the sale of this for your particular field, to your company only."

Lapin consulted with engineer employees of defendant and gave them his ideas. A number of valves were developed and rejected for various reasons. By December of 1947 one was produced that showed promise of meeting Lapin's demands, through the efforts of Lapin and defendant's engineers, but principally an engineer named Tomasek. When the work reached this point Lapin inquired as to cost. There seems to be agreement that defendant at that time was to be repaid for research and production solely out of manufacturing the valve for Lapin. If defendant was unsuccessful in producing a satisfactory valve it got no compensation from Lapin. Defendant gave Lapin an estimate between nine and one-half and eleven cents each, there being some dispute as to the exact amount. Lapin informed defendant this price was prohibitive and that he thought he could get the valve manufactured cheaper. Defendant's officer expressed consent and agreement to this arrangement. Then followed negotiations on the subject of compensation due defendant as a result of that arrangement. An amount of $8,000 was agreed to. Lapin's attorney wrote defendant a letter (Plaintiff's Exhibit 9) on December 22, 1947, on this subject. We quote:

"I am writing this letter pursuant to our telephone conversation of December 18th last, so that we may have a written memorandum of contract. I understand that you and A. S. Lapin, my client, have made an agreement as follows:

"A. S. Lapin is to compensate you for the use of your research facilities in connection with his disposable pressure dispenser in the sum of $8,000.00, to be paid to you out of the proceeds received from the sale of such dispenser, sold or caused to be sold by A. S. Lapin. Payment is to be made as follows: $250.00 is to be paid to you for each 100,000 dispensers sold until the specified sum is paid in full.

"A company is being organized by Lapin to market the product. After the company is organized and in business, it will assume the obligation on the same terms.

"It is my understanding that this agreement for compensation is conditioned upon the fact that Lapin or his company succeeds in selling the dispensers and for this reason the compensation is to be paid only out of proceeds received.

"Please acknowledge receipt of this letter and confirm."

Defendant acknowledged (Plaintiff's Exhibit 10):

"In reply to your December 22nd letter I wish to advise that you may be assured that we are entirely in agreement with and consider fair, Mr. Lapin's proposal to reimburse us for the Engineering Expense that we incurred in assisting him to develop a valve for his Whipped-Cream Dispenser.

"Please have Mr. Lapin execute an agreement as outlined in your letter of December 22nd and we will accept same."

No further agreement appears in the record.

Plaintiff contends that by this transaction it acquired all defendant's rights in the valve referred to and equitably all patent rights owned by defendant, acquired by virtue of its engineers being under a contract to assign all patent rights to it on devices developed while employees. Such an assignment was made to defendant by its employees, including Tomasek, on the valve in question. Defendant replies the two letters contain the whole contract between the parties and include no patent rights. (Plaintiff's Exhibits 9 and 10.)

Following execution of the two letters just referred to, defendant instructed Tomasek to give Lapin full assistance in getting a start in manufacture of the valve elsewhere, including the giving to Lapin any models or drawings he desired. Tomasek carried out these instructions and Lapin availed himself of the offer, including having Tomasek go with him to the law office of his patent attorney and there assist the patent attorney in preparing a patent application on the valve. While at the attorney's office Tomasek made a drawing for the attorney and gave the attorney full cooperation. After leaving the attorney's office Tomasek remarked to Lapin that the application should be made in his name, but Lapin paid no attention to the suggestion.

In February, 1948, plaintiff company was organized. Defendant was so advised (see Plaintiff's Exhibit 11):

"Please be advised that Reddi-Wip has been organized to market the low pressure dispenser. In connection therewith Reddi-Wip agrees to compensate you in the sum of $8,000.00 to be paid for out of the proceeds received from the sale of the disposable pressure dispenser as follows: $250.00 is to be paid to you for each 100,000 dispensers sold until the specified sum is paid in full."

Plaintiff achieved signal success not only in perfecting the valve by making minor improvements, but by commercially exploiting the product. Of this defendant was aware. October 6, 1948, plaintiff made his first payment on the $8,000 conditionally due to defendant. On October 8, 1948, defendant wrote plaintiff's attorney (Plaintiff's Exhibit 18):

"Your letter of October 6th received with check enclosed for $250 as part payment on development work amounting to $8,000, done for Mr. Aaron S. Lapin on the Reddi-Wip cream dispenser.

"We call your attention to the understanding with Mr. Lapin as covered by his letter of September 22, 1947 and our letter of September 25, 1947. We were to make and furnish the dispensing head on which we, of course, expected to make a reasonable profit. We would not have done any development work on purely a cost basis unless we were going to get the manufacture of the unit as you might readily understand since we are in the manufacturing business of various types of dispensers.

"There is also a patent situation which we have not gone into nor has it been discussed. We have prior patents on whip cream dispensing devices that we believe in a broad way cover some of the present dispensing means. Also we have patents pending on the cream whip dispenser in question.

"We would appreciate your discussing with Mr. Lapin his intention regarding our manufacturing the dispensing unit for either him or the company that he has organized, also any rights that he may desire under present patents or patents pending."

Plaintiff filed his patent application February 6, 1948. Defendant filed his patent application, in name of Tomasek and Zimmer (another employee of defendant who worked on the valve) in September, 1948. Declaration of interference followed.

## I.

Defendant challenges jurisdiction by denying the jurisdictional amount necessary in a diversity case is involved in this case.

Using the structure that is the subject of the patent interference, during the year ending February 8, 1951, plaintiff's sales exceeded $3,500,000. For the same period over $500,000 was spent in promotional advertising. Large sums have been spent in plant development. Plaintiff has paid defendant the $8,000 agreed, for defendant's expenses in helping to develop the valve device. Attorney's fees incurred by plaintiff in the patent interference is now estimated at $3,500. A patent application by a stranger to this suit is involved in the interference, which interference was declared several months after the applications for patent of plaintiff and defendant. Defendant has offered this applicant $1,500 for an assignment. A like offer was made to plaintiff during the trial of this case. R. S. Knapp testified use of the valve was well worth $8,000 to plaintiff.

We conclude the statutory amount set out in the complaint is involved in this case. While not of definite ascertainment, we believe it evident, if plaintiff should fail in this case, and defendant secure a patent, the resultant loss to plaintiff would far exceed $3,000, exclusive of interest and costs. If plaintiff should succeed in the interference and secure a patent, the cost to it directly from conducting the prosecution of its claim would exceed the requisite amount. Both of these matters are directly at issue in this proceeding and are not collateral to it. Mitchell Metal Products v. Berkeley Equipment Co., D.C., 36 F.Supp. 1010.

## II.

We cannot agree with defendant that the two letters (Plaintiff's Exhibits 9 and 10) express the agreement of the parties in its entirety, and any relief granted must find a basis within the four corners of those two documents. Plaintiff's Exhibit 9 provides only for payment of money by plaintiff to defendant—nothing more. Yet plaintiff must, within the contemplation of the parties, have received something for this consideration. That defendant did not regard it as complete is indicated by Plaintiff's Exhibit 10. There defendant asks for "an agreement" which was never executed. Again, defendant carried on its part of the negotiations through its vice-president, R. S. Knapp, a son of the president of the company. The father informed the son the letter did not go far enough. Lipsky testified R. S. Knapp told him plaintiff was getting everything "lock, stock and barrel". R. S. Knapp told Tomasek to give plaintiff any drawings and models that would be helpful to plaintiff and to assist plaintiff in any way he could in getting started in the production of the valve elsewhere. None of these considerations, the subject-matter of this suit, are mentioned in Plaintiff's Exhibits 9 or 10. The letter, with the circumstances, leaves no doubt that for the $8,000 plaintiff was to receive and defendant was to transfer certain rights to use of the valve developed, as of the writing of Plaintiff's Exhibits 9 and 10. The decisive question is the nature and extent of property transferred.

Defendant's letter of October 8, 1948, signed by the father of R. S. Knapp, is so far at war with the intent of the parties, at the time of writing Plaintiff's Exhibits 9 and 10, that R. S. Knapp as a witness was unable to give any plausible explanation of its meaning and purpose. Although the October 8th letter contains a plain inference that plaintiff is infringing defendant's patent application and plaintiff must get a license to continue manufacture of

the valve if a patent is granted, this witness refused to commit defendant one way or the other on the subject and said he did not know what his father's intentions were. He conceded it was difficult to reconcile the October 8th letter with the transaction he consummated for defendant with plaintiff in the previous December.

Nor do we agree with defendant that this is an action to enforce specific performance of the agreement as set forth solely in Plaintiff's Exhibits 9 and 10. Plaintiff's suit is to confirm possession in law of an equitable title in property obtained by plaintiff on payment to defendant of $8,000, and which property defendant is now in the process of taking from plaintiff.

■ We conclude from the record that plaintiff and defendant both made substantial contributions to the development of the valve. The exact proportions it is impossible to determine. The intentions of the parties in this development is plain. Plaintiff wanted a product it could sell commercially. Defendant wanted to manufacture and sell that product to plaintiff. It was a business relationship involving mutual confidence, mutual effort, and a mutual hope of profit. Under these circumstances defendant could take no advantage to itself in derogation of the interest of plaintiff.

See Lukens Steel Co. v. American Locomotive Co., D.C., 99 F.Supp. 442, 447; Baker Oil Tools v. Burch, 10 Cir., 71 F.2d 31, at page 37; Shell Petroleum Corp. v. Pratt, D.C., 22 F.Supp. 304, at page 307; Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587; Trice v. Comstock, 8 Cir., 121 F. 620, at page 627, 61 L.R.A. 176.

"Wherever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or the law, that he becomes interested for him, or interested with him in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interest he has become associated." Baker Oil Tools v. Burch, supra.

■ We think the ruling in Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, applies in this case. Many cases adhere to the rule announced in that case, to the effect that one who is employed by another to develop a certain process or device and who patents an invention made by him in the course of the employment, holds such patent for his employer. Although there was no fixed obligation to pay defendant anything, the payment being conditioned on successful use of the valve by plaintiff, the facts are undisputed plaintiff has paid defendant every cent demanded. If defendant made a bad bargain, in light of subsequent events, that does not destroy the relationship or the mutual obligation.

We think light is shed on what the parties intended by the early correspondence of September 1947. There plaintiff definitely informed defendant of its intended use of the contemplated structure that defendant was helping to develop. Plaintiff wrote defendant—

"we are anxious to see that you grant us, the Sta-Whip Company, Inc., the exclusive right to purchase such heads from you for the use of whipped cream, as well as other edible food products which we may from time to time develop or co-operate in developing with other people."

Plaintiff further informed defendant in that letter—

"It is of course understood that this dispensing head and all attachments thereto which may be developed will be sold to no one else for purposes outlined above except our company, and therefore we are so advising you so that we may have the protection of such exclusive right granted into our company."

And concluded the letter with this statement—

"We understand that there will be no patent infringements of patent rights in the use of this dispensing head as purchased from you."

To all of these conditions defendant consented by its letter of September 25, 1947.

This record is silent that plaintiff ever retracted any of the conditions of its letter of September, 1947. Is it any wonder that R. S. Knapp was unable to offer any explanation of his father's letter calling on plaintiff to discuss licensing rights with it, in view of defendant's application for a patent.

If defendant were retaining patent rights or in any way qualifying plaintiff's use of the valve, different from expressed in the September, 1947 correspondence, defendant had a plain duty to reveal it at the time of the agreement to accept $8,000, "lock, stock and barrel" for the valve. Defendant could not remain silent, lead plaintiff to exploit the valve to where it has a great commercial value and then spring a hidden reservation, not theretofore hinted at in any manner. Defendant permitted its engineer to go to plaintiff's patent attorney's office and make drawings in prepartion for a patent application and still remained silent. Such conduct by plaintiff was open and defendant must have had notice of it. Plaintiff filed its patent application in February, 1948. This doubtless became known to defendant before it filed application in September of 1948. The conclusion is evident that defendant moved for a patent after learning of plaintiff's success in use of the valve. At no time, prior to October 8, 1948, did defendant raise any question of plaintiff's right to patent the valve or make known any claims they had in that respect.

We find that defendant's representative who presented the valve model and papers to plaintiff had knowledge of plaintiff's intended use of it and was hopeful of such use at least to the extent of the $8,000 payment to be received by them; defendant knew that delivery of the design was intended to influence plaintiff in its use commercially of the valve and that failure to disclose retention rights by defendant and intended patent application would mislead plaintiff into belief it had full property in the valve without limitation for food purposes; that defendant was bound to disclose to plaintiff its patent claim which, if granted, would provide defend-

ant with means to prohibit plaintiff from use and license of the structure tendered as the subject of the $8,000 payment; that defendant's transfer to plaintiff of the design for the valve carried with it a representation to make the transfer effective, otherwise they were engaged in a useless act and there was no consideration for the $8,000.

Strict words of sale of the design were not used but under the circumstance leading up to the transfer and representation of defendant, we think the same principle of law should apply as in the case of sale of a patented article.

That defendant's engineer informed plaintiff that the patent should be applied for in the engineer's name is not of material consequence. Plaintiff paid no attention to the suggestion—nor did plaintiff's patent lawyer who must have been acquainted with all the facts. Plaintiff apparently was relying on its receipt of models and drawing and broad offer of help from defendant, the conditioned obligation to pay $8,000 and Lapin's contribution to development of the valve.

We conclude that in equity and good conscience defendant should not be permitted to interfere with plaintiff's exclusive use of the valve structure represented in the two patent applications, that plaintiff is entitled to the perpetual exclusive use of it in connection with food products on non-refillable containers and with unrestricted licensing powers in conformity with such interest.

The record in this case does not disclose the contents of the patent applications of either plaintiff or defendant. No evidence or representation is before the Court that the patent applications go beyond the use of the structure, for food products and for a dispensable container. Such being the case defendant would have no interest in prosecuting its application under the Court's ruling.

Let decree be submitted that defendant assign to plaintiff, within thirty days, its patent application No. 51386, without reservation, and upon failing to do so this decree shall operate as such assignment.

Let defendant be enjoined perpetually from interfering with plaintiff's use, directly or indirectly, or with the use of plaintiff's licensees, of the structure described in the patent applications.